This is the time set for argument in the case of Mellow v. Saul and Mr. Walker, you may proceed. Thank you, your honors, my name is Jared Walker and thank you for hearing my client Sean Mellow's case. May it please the court, I'll try to reserve two minutes of my time, I do see the clock so I'll try to keep an eye out. The main issue here is the two errors that are wrapped up in the step five finding, that is the government having the burden to identify jobs can perform, whether those errors are harmless. Now, the only evidence we have that the government met that burden is the vocational expert naming three listings from the Dictionary of Occupational Titles, the DOT, and that's it. The problem with that, as my client sees it, is that in why the two errors in step five can't be seen as harmless, is that the text of the DOT, which is all the vocational expert gave us, can't be matched up with two of the limitations the ALJ assigned to Mr. Mellow. And those two limitations are his need for a sit-stand option at least eight times through the workday, and then also the balancing limitation that the vocational expert was never asked about and never spoke to. Those two limitations, we think, appear to present enough of an inconsistency with the text of the DOT that the errors can't just be wiped away as harmless. The two recent cases from the court, Lemire and Gutierrez, I think frame the issue here quite well. And my interpretation of where those two cases put us is that if the court, from its own common knowledge, from our common experience with the jobs identified, can interpret the My client believes that this case fits squarely with Lemire, which held that there is a conflict, an apparent conflict, with the DOT if the jobs at issue can't be reconciled based upon common knowledge. And the jobs at issue here are, I think... Excuse me. What exactly does a sit-stand option mean, or does the record show what it means? How... I mean, there are very few jobs in which you're tied down to your chair and you can't stand up for a minute or two. Is that what we're talking about, or are we talking about something else? Well, I think that's the problem, is the vocational expert wasn't told... I'm asking you what the sit-stand option that he needed was. What does the record demonstrate about what he required? The only thing that the record shows is that the ALJ assigned the need to stand every hour for a brief period of time, and that's the RFC finding prior to Step 5. Now, why that's important, what I would say is a rather vague limitation, is that there's a social security ruling, 8012, I believe, cited in the reply brief I know. But what that ruling says is that, look, this sit-stand limitation for these unskilled type of sedentary jobs needs to be defined, because there often will be great difficulty in doing those types of jobs if you have to... The definition of sedentary work is the sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. I understand that that's running in the other direction, but certainly the definition doesn't seem to find sedentary as meaning sitting. Well, but I think that the government having the burden to flush out that issue, to convince a reasonable mind that with that obscure limitation, these jobs can still be performed. I think that that is why the errors aren't harmless. What the SSR 83-12 does put a duty on the Administrative Law Judge to do is to specify what the exact limitation is we're talking about. And, you know, the need to stand every hour or sit down and change positions for a, quote, brief period of time. I don't think that is... Michael, I found the... ...serving, and that is the communication limitation, and the fact that it wasn't included at all, right? Is that what... Right. And that the ALJ or the government has a rather strange interpretation of what those notations meant, i.e. that they only had to do with the loud noise, which doesn't appear to be the case. Right. And there's another SSR that's in the required brief. I don't have it up here, but that SSR specifically says that the limitation isn't just the inability to talk. There's a hearing component, which my client clearly has. I mean, his hearing is reflected throughout the records. And that's true whether his hearing in one ear has gotten somewhat better recently. He still has a certain hearing problem. Right. And he was born deaf in one ear. After his heart surgery, he inexplicably lost hearing for at least a year. In that other ear, even when it came back, it was still diagnosed as a moderate to severe hearing problem. And so it's not like he was cured. What the record shows is that he didn't need implants. Then the government says, well, okay, so two of the three jobs then might be out. But the third one wouldn't matter anyway, and it's sufficient. And is that the... Printed circuit layout. I don't know where they get these jobs from. And that's the problem. No one knows what a printed circuit layout taper is in Goop's hearing. It doesn't say anything in the description that suggests you have to hear anything. Well, but I mean, it also doesn't say that a person can sit and stand with a balancing limitation. I understand that. Yes, that's probably the one that's most... Right to the sit stand. And, you know, so taking a big picture look at it, you know, at step five, the government had the burden. There's error upon error upon error. And, you know, at some point, I think just the overall effect of those multiple legal errors, you know, from a harmless error standpoint to say that the court can be confident that those multiple errors didn't affect the outcome. I think that's a tough threshold to clear, especially when you're looking at the limited number of jobs that the government was able to identify to satisfy the step five burden. This isn't, you know, hundreds of thousands of jobs that according to the governance of an expert are out there. Nationwide, we're limited to, I think, 40,000 or 4,400. That's a problem that's very inherent in this, in my view, rather questionable system because there can be a rather small number of jobs. They don't have to be anywhere near where he lives and so on. That number of jobs is a sufficient number of jobs under the president. Well, but the point is, isn't that the job numbers itself are error? The problem is, is that these jobs by the government's own expert are so obscure, they barely exist, that how can we say that common knowledge fills in the gaps between the text of the DOT and these limitations? The question of common knowledge is a question of reading the description and seeing what is in the description inherently gives rise to the relevance of the patient. And it seems, I mean, just off the top, to me, that the taper one does eliminate the pertinence of the communication, but doesn't eliminate the pertinence of the sit-stand and the other two don't eliminate the purpose of the communication, but they do eliminate the relevance of the sit-stand. So, I don't know where that leaves you, but just the description, it's not a question of common knowledge, it's a question of reading the description. Well, I think where it leaves us is that if the government truly does have a burden, and that's just not, you know, an empty word applied to these types of cases, then those questions that Your Honor is raising help establish why these errors can't be wiped away as harmless. There is enough of an apparent doubt between the text of the DOT and the patient that I was asking. And, you know, going back to Lemire, in that case, there were quite a few more jobs that were identified to exist nationwide. And so, you know, the only point to the job number reference is that here, we know, there's no question that these jobs barely exist. It is enough to satisfy, you know, the requirement that... One of them, election clerk, seems like a pretty... It's an existing phase right now. I don't know if I know if it exists. Well, it's a good point because, you know, when the DOT was last updated 30 years ago, I don't think election clerks had to do what they're doing now. And so, you know, what the job vocational expert identified actually consists of, it's an open question if all you have is just the text of the DOT. Now, the nature of the error or the first error at step five, I think, is also important. And that is that the administrative law judge had an affirmative duty to confirm that the vocational expert was testifying consistent with the DOT. We don't even have that. And I think that's another instance where if, you know, that duty is going to be affirmative on the ALJ, then going through great lengths to find harmless error wipes that characterization of the duty. It just renders it meaningless, I think, to what too large extent to uphold this step five finding. You're down to about a minute and a half. Do you want to reserve? I will. Thank you, Your Honor. Clear from the government? Good morning, Your Honors. Elizabeth Feer for Andrew Saul, the Commissioner of Social Security. I'd first like to address the issue of the fit-stand option and whether or not it's been defined in the record. It's actually very well defined. The ALJ said that the claimant can sit for eight hours in a workday with a fit-stand option after one hour, whereupon he could change position without leaving his workstation. And then as far as the walking goes, the ALJ said two hours with a position change after 25 to 30 minutes, and that position change could last five to 10 minutes. That's very detailed, and the ALJ presented that to the vocational expert. The point of it is the claimant has the option to change positions when he needs to, which is what his doctors said that he needed. So that's a very detailed fit-stand option, and the V.E., who is the expert here, testified that these three jobs can be performed with that fit-stand option. No one challenged the V.E. on that particular issue, and I think the court should be taking notice that that's the expert testimony, and the expert is the one here who is charged with taking what the DOT says about jobs and turning that into an identification of jobs that this person can do with those particular limitations. So I don't think that there is any question about any of those three jobs, which are all fit-stand option, given the expert's testimony, which is entitled to deference. It's substantial evidence. He was given the fit-stand option requirement, and the problem that's being pointed to is that he wasn't asked whether that's consistent with the DOT. The answer to that question is one doesn't know. I don't know how he would answer that question, because the DOT just doesn't address it. Right, and that's a key issue with this particular limitation that comes up in a lot of cases. There are several courts, including this one in Dewey v. Coleman, which was, I think, 2012, 2014, has said that it's something that doesn't exist. So there is no fit-stand in the DOT. Therefore, our position is it's not a conflict, which is not the same thing as, say, in Gutierrez, there was an issue of a DOT conflict with reaching. In Lemire, it was manipulation. Well, those things actually are in the DOT description, so you can argue about whether or not the specifics control the general, but here there is no fit-stand option in the DOT. Everyone knows that, so our position is that should not be a conflict. And what you have here is the V.E. understanding that's a limitation, knowing, as it's his job to know, that it's not in the Dictionary of Occupational Titles, so he found these jobs that he acknowledges in the hearing that he's focusing on these sedentary jobs because of the fit-stand option. So I don't think there is any question here that this vocational expert was well aware of this particular limitation and provided expert testimony that satisfies that particular limitation. With respect to the hearing... Before you go on that, Dewey was an unpublished case, right? That's true. There are no published cases on this particular matter. Okay. Thank you. Yes. And claimant does cite an earlier case, Coleman, but in that case, this court had said that the V.E.'s testimony was uninformed speculation, uninformed guesswork. And in that case, there was an issue between whether or not the jobs that satisfied the limitations were sedentary or light. Here, it's very clear they're sedentary. The question that is required to be asked through a sponte is, is there a conflict with the D.L.T.? Is that the question? Or how do you reconcile the conflict with the D.L.T.? Or what exactly? The ALJ is supposed to ask the vocational expert whether or not his testimony is consistent with the DOT. Okay. But an acceptable answer is, well, it's consistent, but it doesn't cover by the D.L.T. But I know that, in fact, it has a sit-stand option. That would be an acceptable answer. Yes. And I think... Well, once again, this sit-stand option isn't a conflict because it doesn't exist in the DOT. And again, I would say it's different than problems we have with reaching or manipulative or the kinds of work-related activities that actually are contained within a DOT description. This one, everyone knows it's not in there. So, it's true that the ALJ didn't ask whether or not the V.E.'s testimony was consistent with the DOT. But again, this is not a matter of consistency with the DOT. This is a matter of whether the V.E. in his expertise can find jobs that accommodate the limitation. So, what about the communication limitation? Okay. And so, the ALJ... It's true that the ALJ interpreted the state agency physician's limitations as being... In a loud environment. In my view, that is a flat misreading of what the limitation says. It just makes no sense. Well, that's your prerogative, Your Honor. And second of all, if you're limited to not having loud noises, you're limited to not having loud noises, not just to not communicating. I don't understand that. So, suppose we thought that was just an erroneous interpretation of the limitation. Then what? Well, assuming that you think that, and I would just point out that substantial evidence review means that even if you disagree with the ALJ's interpretation of the evidence, if it's reasonable and the district court found it reasonable, you should uphold it. But assuming that you find it... Let's just forget about the content, about ignoring the semicolon that's right there. Okay, so those decisions issued in January and April of 2015. Klayman underwent audio testing subsequent to that, of which the ALJ was aware. He underwent that testing in May 2015. And you have his audiologist specifically say that with respect to the improvement from Klayman's 40% loss in January 2014, his improvement to 64% hearing in the left ear. Or improved 64%? Well, the point of that, irrespective of what we know that to mean... Did it improve by 64% or did it improve to 64%? It improved to, from 40% to 64%. So this is on page 348 in the administrative record, page 371 in the excerpts. The audiologist specifically refers to that improvement as functional residual hearing. So if the audiologist is saying after the state agency doctors made that contested finding about loud noises and occasional communication, subsequent to that you have a hearing expert say he has functional residual hearing. That's the salient fact in this case as far as the Klayman's hearing goes. So again, there's no... If Klayman has residual functional hearing, he can perform the jobs in question. There's no additional evidence. He's always been deaf in one ear. So what? That doesn't really address the fact that he's always been. It doesn't demonstrate that for the particular jobs that were identified. It doesn't matter that he can't hear at all in one ear and then he hears 64% at best in the other ear. Well, again, your Honor, I would direct you to the language that's specifically in the audiologist's report, that whatever the percentage of his remaining hearing is, it's functional. And if he's functional, he can work. The problem was that this wasn't told at all to the... It wasn't in the RFC at all. Well, the ALJ did not find that Klayman had those particular communicative limitations. He interpreted that, and again, substantial evidence allows the ALJ to come up with a reasonable interpretation and again, a federal judge or magistrate judge found that that was reasonable. The ALJ interpreted the Klayman's hearing as prohibiting him from being in loud environments without protection. And he presented that to the vocational experts. So we can all look at this record and come to different conclusions about what the Klayman's hearing limitations imposed, but again, the record shows he's functional and all of those jobs should be able to... There's no reason he can't perform those jobs with functional residual hearing. If there's any other questions about that, I'm happy to answer them, but my opponent also brought up the balancing and all three jobs have no balancing. There's no reason for the court to find any conflict with the DOT on that issue either. So we have a very detailed residual functional capacity finding here that is supported by the medical evidence and very well detailed in terms of the ALJ's articulation and we ask that you uphold that because Klayman has not pointed to any harmful error. You want to briefly discuss the essentially credibility finding with regard to his testimony regarding the extent of his limitations? In other words, the problem, or if there is a problem, is that the ALJ, the general rule as I understand it is that as long as there is medical support for the fact that his impairments could cause this kind of limitations, then you don't need medical support for the fact that they actually of the extent of his limitations, is that right? That's right. Well, that's right to a certain extent. There are some Klayman doesn't have to prove the extent of say pain or particular limitations that can't be quantified, but what you have here is Klayman is alleging that mostly that he can't work because of his right foot residuals from his cardiovascular accident and because he has fatigue. So the right foot problem is he can still walk, he can still drive, he can still perform all of his activities of daily living and those are rather extensive and very consistent with the ability to perform sedentary work and my opponent does not really address those things at all in the record. Klayman is admitting he's doing light chores, he's grocery shopping, he's cooking, he's watering plants, he's using the computer, he's using an elliptical machine, he's getting his girls ready for school, picking them up, playing fantasy football on his computer and on his phone, which also should show that he has if he's using his phone, he's able to hear enough to use his phone. The other symptom that he has is fatigue and first of all, the fatigue is very limiting, so even if Klayman does have some amount of fatigue, that is being accounted for with this less than sedentary residual functional capacity. And the other thing I would like to point out is Klayman testifies that he has this fatigue because he has to take naps in the middle of the day, but he also testified that he stays up until 1 or 3 in the morning and then gets up at 7, so that makes sense that he would have to nap if that's the amount of sleep he's getting, particularly given the activities that he's doing throughout the day. And the ALJ addressed all of this the ALJ also pointed out how notwithstanding Klayman's really significant accident that he had in December 2013, subsequent to that he has very normal medical examinations, but for the right leg problem, which we know is accommodated for with not only the sedentary RFC, but the sit-stand option. And then we have Klayman had a cardiac condition even before December 2013. His cardiologist is saying that subsequent to his tragic incident, he is cardiac stable to the point where he has the ability under that MET system, M-E-T-S that he can perform level 6, which means he can do yard work, he can walk upstairs and he can walk up hills. So the ALJ points to all of this, all of that medical evidence is consistent with the residual functional capacity that the ALJ assessed and inconsistent with Klayman's exertions that he's too fatigued or too limited to perform sedentary work. Judge Schroeder, you're muted I think. No, we had doorbells ringing. Just to answer one question for me, what is a printed circuit layout taper? The VEX explains it at the hearing. It's someone who puts together puts mylar sheeting onto circuit boards so they take a blueprint of whatever this mylar thing is and tape it onto the circuit board. And it's actually the lowest level reasoning job out of all of those. So it's apparently not very complicated. Thank you, Counsel. We ask that you please uphold the District Court's decision affirming ALJ. Thank you. Yes, Your Honor. I'm not going to touch on the characterization of the medical record and my client's limitations. The record speaks for itself there. As to the sit-stand option being detailed, it's not detailed because it doesn't include anything about the balancing problems. These work functions concern the same categories of work functions. If Mr. Mello has to get up and down at least eight times during a day, but he also has the problem with balancing, how does that happen? The record doesn't show it. There's no explanation from the VE. We don't even know if those limitations that are assigned are consistent with the VA because of the ALJ's clear errors. And so, respectfully, if these terms, again, that Step 5, the burden shift to the government, that the ALJ has an affirmative duty to make a clear record, if that is to mean anything, respectfully ask that the Court remand so that these cases perhaps can work a little bit better. Thank you, counsel. Thank you both for your work. Go ahead and finish. I was just going to thank you for having me. Yes, no, thanks to both of you for appearing and I'm sorry for the short delay that we had for technical problems today and the case just argued will be submitted for decision.
judges: Schroeder, Thomas, Berzon